VICKSBURG GAS CO. v. FERGUSON.[*]

(In Banc. Dec. 7, 1925.)

[106 So. 258. No. 25028.]

MASTER AND SERVANT. *Automobile not dangerous instrumentality, rendering owner liable for driver's negligent use.*

An automobile or auto truck is not a dangerous instrumentality, so as to render its owner liable for negligent use of it on a highway by the owner's employee, who had borrowed it for a purpose disconnected with owner's business.

ETHRIDGE and HOLDEN, JJ., dissenting.

---

[*]Headnote 1. Motor Vehicles, 28 Cyc., p. 39.

APPEAL from circuit court of Warren county.

HON. E. L. BRIEN, Judge.

Action by Mrs. B. P. Ferguson against the Vicksburg Gas Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

*Brunini & Hirsch,* for appellant.

Mr. Fuller was not about his master's business when the car which had been loaned to him, by the Vicksburg Gas Company, had the collision with the Ferguson car. On the Easter Sunday in question Mr. Fuller had borrowed the truck of the Gas Company, as his own car was a two-seated Ford Runabout, and wouldn't carry his children, and the children of his neighbors, to the Easter egg hunt picnic, in the National Park.

The appellant asked the court to instruct the jury to find for it. This instruction should have been given, and we are now asking this court to do what the court below should have done. We are not going to burden this court with any extensive citation of authority. See Huddy on Automobiles (6 Ed.), sec. 642; Babbit, on Motor Vehicles (3 Ed.), 729, secs. 1152 to 1158.

*A. A. Chaney,* for appellee.

The courts are uniform in holding that where the employee temporarily abandons his work and departs on a mission of his own, the master is liable for his tortious acts after he starts on his return journey to his work. So, even if it should be held that Fuller was not on duty while at the picnic, and in going to the picnic grounds, notwithstanding the fact that it was admitted that he was on duty, under the ruling of this court, the employees, Fuller and King, were on duty on their return to their place of work, the Gas Plant. The fact that they had a child or two to put off on their way to their work could make no difference in this well-established rule. This rule has been very definitely approved by our own court in *Barmore* v. *Vicksburg, Shreveport & Pacific Railway Co.,* 85 Miss. 462, 38 So. 210.

An automobile is a dangerous agency and instrumentality. They are not *per se* dangerous, as most courts hold, yet they may become very dangerous when not properly run and operated. The courts, as well as the legislatures throughout the country, are beginning to recognize the many dangers incident to the use and operation of automobiles. Our own state, through its legislature, has, from time to time, enacted special regulations for the control and operation of the various motor vehicles on the public highways in this state. These regulations impose certain duties on the owners of all motor vehicles, specially requiring licenses, tags and numbers for identification, and providing that no automobile shall be run and operated, or caused to be run or operated at a greater rate of speed than ten miles per hour around a curve, not faster than eight miles per hour in passing a pedestrian, not over ten miles per hour in crossing a bridge, and require the sounding of an alarm in passing people on the highway, and that, in case of accident, the name and address of the owner shall be given. By the enactment of these laws, our legislature recognized the dan-

gers incident to the operation of automobiles. While the enactments of the legislature do not make any change in the common-law rules relative to the liability of employers for the negligence of employees, yet they impose upon the owner of automobiles certain duties not imposed upon owners of any other class of vehicles, clearly indicating that the lawmakers recognized the great danger incident to the operation of all classes of motor vehicles. The courts of the country have also, for good reasons, recognized the dangers connected with the operation of automobiles and other dangerous instrumentalities. It is uniformly held that where an employer trusts to his employees the control, use, and operation of automobiles, or other dangerous instrumentalities, for their personal use in going to and from their work, or to be used by them at their pleasure, that the master is liable where injury occurs by reason of the negligent operation thereof. *Ingraham* v. *Stockamore,* 118 N. Y. Supp. 399; *Anderson* v. *Southern Cotton Oil Company* (Florida), 74 So. 976. Also to the same effect see *Studebaker Bros.* v. *Kitts* (Texas), 152 S. W. 464.

It has been repeatedly held that the ownership of an automobile is *prima-facie* proof that the custodian of the car is acting within the scope of the owner's business. Arkansas—*Terry Dairy Co.* v. *Parker,* 223 S. W. 6; Arizona—*Baker* v. *Masceh,* 20 Ariz. 201, 179 Pac. 53; California—*Dierks* v. *Newsom* (Cal. App.), 194 Pac. 519; Iowa—*Hall* v. *Young,* 177 N. W. 694; New York—*Ferris* v. *Sterling,* 214 N. Y. 249; Oregon—*West* v. *Kern,* 88 Oreg. 247; Tennessee—*Davis* v. *Newsum Auto Tire & Vulcanizing Co.,* 141 Tenn. 527; Washington—*Moore* v. *Roddie,* 103 Wash. 386.

It is also generally held that evidence of defendant's ownership of an automobile, together with proof that the driver is in his employ, raises a presumption that he is acting for the owner in operating the machine, and within the scope of the owner's business. United States—*Benn* v. *Forrest,* 213 Fed. 763; *Foundation Co.* v. *Henderson,*

264 Fed. 483; Alabama—*Penticost* v. *Massey,* 201 Ala. 261, 77 So. 675; *Dowdell* v. *Beasley* (Ala. App.), 82 So. 40; California—*Chamberlain* v. *Southern Cal. Edison Co.,* 167 Cal. 500; Colorado—*Ward* v. *Teller Reservoir & I. Co.,* 60 Colo. 47; Georgia—*Fielder* v. *Davidson,* 139 Ga. 509; Kentucky—*Wood* v. *Indianapolis Abbatoir Co.,* 178 Ky. 188; Michigan—*Hatter* v. *Dodge Bros.,* 202 Mich. 97; Missouri—*Guthrie* v. *Holmes,* 272 Mo. 215; *Long* v. *Nute,* 123 Mo. App. 204; New York—*Ferris* v. *Sterling,* 215 N. Y. 249; *Rose* v. *Balfe,* 223 N. Y. 481; *Stewart* v. *Baruch,* 103 App. Div. 577, 93 N. Y. Suppl. 161; *Stern* v. *International Ry. Co.,* 167 App. Div. 503, 153 N. Y. Suppl. 520; *Bogorad* v. *Dix,* 176 App. Div. 774, 162 N. Y. Supp. 922; North Carolina—*Wilson* v. *Polk,* 175 N. C. 490; *Clark* v. *Sweeney,* 175 N. C. 280; Oregon—*Kahn* v. *Home Tel. & Tel. Co.,* 78 Oreg. 308; Tennessee—*Frank* v. *Wright,* 140 Tenn. 538; Texas—*Gordon* v. *T. & P. Mercantile & Mfg. Co.* (Civ. App.), 190 S. W. 748; Washington—*Kneff* v. *Sanford,* 63 Wash. 503.

This is not a case where an employer, without any reservations, lends a motor vehicle to an employee. The testimony is clear that the defendant retained control over the employees as well as the truck. The men were on duty, this being admitted by the president of the defendant company. The defendant wanted to know the exact whereabouts of the truck and the men, so its president stated. Fuller, the foreman, and King, the driver, were on duty, so Mr. Fuller stated. They were returning to their work at the time of the collision, so the foreman testified.

With such testimony before the trial court, was the defendant entitled to a directed verdict? Certainly the court will not so hold.

Anderson, J., delivered the opinion of the court.

Appellee, Mrs. B. P. Ferguson, brought this action in the circuit court of Warren county against appellant, Vicksburg Gas Company, for damages done her automo-

bile by means of a collision between it and an automobile truck belonging to appellant, and recovered a judgment for sixty-six dollars and fifty cents, from which appellant prosecutes this appeal.

Conceding every material fact which appellee's evidence tends to prove, the question is whether or not there is any liability on the part of appellant. If that question is to be answered in the affirmative, then the verdict and judgment appealed from must stand. On the other hand, if it is to be answered in the negative, appellant was entitled to a directed verdict in its favor as requested..

Appellee's evidence showed that the collision and damage done her car was through the negligence of the driver of appellant's truck, one R. W. Fuller, who was at the time appellant's plant foreman, but was driving appellant's truck on a mission of his own. On the day of the collision between the truck and car there was an Easter egg hunt for the children in the National Military Park at Vicksburg. Mr. Fuller, appellant's plant foreman, borrowed one of its commercial trucks used in connection with its business for the purpose of transporting to and from the Easter egg hunt several children. It is therefore without conflict in the testimony that at the time of the collision Mr. Fuller, the driver of the truck whose fault caused the collision, was not acting in furtherance of his master's business (the business of appellant), but was acting entirely without the scope of his authority.

Appellee, however, seeks to justify the judgment appealed from upon the principle that an automobile is a dangerous instrumentality—is *per se* dangerous—and therefore the owner is under the duty to so guard it and control it as that it will not cause injury to others. In other words, appellee would classify automobiles with what are called dangerous instrumentalities such as ferocious animals, dynamite, gunpowder, and other inherently dangerous contrivances and agencies, and hold the owner liable for injuries resulting in its negligent operation whether the driver be the servant or bailee of

the owner. If an automobile is to be so classified, undoubtedly, under the authorities, the owner is liable for injuries caused by its being negligently operated regardless of whether the driver guilty of the negligence be his servant or bailee.

The question, therefore, is whether or not an automobile is such a dangerous agency as that it is the duty of the owner to so control it and guard it as that it shall not cause injury to others. Babbitt, on the Law Applied to Motor Vehicles, section 615, pp. 409-410, states that an examination of the cases on the subject discloses that they are practically unanimous in holding that a motor vehicle is not in the class of dangerous agencies; that they are not to be classified with what are called dangerous instrumentalities such as ferocious animals, dynamite, gunpowder, and other inherently dangerous contrivances, and that statement appears to be true. In section 609, page 400, of this work, the author speaks of two decisions which indicate a drifting the other way. In discussing those cases he uses this language:

"A statute giving a liability *in rem* on an automobile causing an injury has been recently upheld, and in another case flying in the face of all previous authority the court leaves it to the jury to say whether the owner of a car is liable for the negligence of his chauffeur while driving on an errand of his with the consent of the owner. The court attempts to justify his revolutionary decision by stating that the common law does not permit one to authorize another to use on the public highway an instrument which is peculiarly dangerous in its operation without imposing on such owner liability for negligent use. The liability grows out of the obligation of the owner to have the vehicle properly operated when it is by his authority on the public highway, and in another recent case the motor vehicle has been expressly called a 'dangerous instrumentality.' The peculiar thing about these decisions in Florida and Kentucky is that they apparently overrule contrary decisions in these states."

There is a full and apparently exhaustive treatment of this subject in Berry on Automobiles (4 Ed.), section 1146, p. 1025, sections 1244 to 1251, inclusive, pp. 1125 to 1130, inclusive. See, also, Huddy on Automobiles (6 Ed.), section 642, p. 824. The authors of these works on the law as applied to motor vehicles appear to be in accord that to class such vehicles as dangerous instrumentalities in the sense of the doctrine contended for by appellee is substantially against the unanimous holding of the courts.

Among other authorities, appellee refers to *Barmore* v. *V. S. & P. Railway Co.,* 85 Miss. 426, 38 So. 210, 70 L. R. A. 627, 3 Ann. Cas. 594. In that case the driver of the railroad tricycle which caused the injury was the servant of the railway company. When the driver of the tricycle took the machine out for the day's work on the day the injury took place through his negligence, he did so in furtherance of the master's business. Before he returned the tricycle to the master the injury took place for which suit was brought. The court held that it was a question for the jury and not for the court whether or not the tricycle was a dangerous agency in the meaning of the principle contended for here by appellee. We do not think that case is decisive of the question here involved.

In view of the rapid development of scientific knowledge and the great progress made of late years in mechanical inventions, many things at one time viewed as *per se* dangerous agencies are now considered of much benefit to mankind. The test is the degree of care required according to the circumstances in order to prevent these agencies becoming dangerous instrumentalities. Babbitt's Law Applying to Motor Vehicles, section 614, pp. 408 and 409. The result of our view is that this case must be reversed and judgment here for appellant.

*Reversed, and judgment here.*

ETHRIDGE, J. (dissenting).

Judge HOLDEN and I are of the opinion that an automobile or a motor truck, while being operated upon the

public highway or street, is a dangerous agency *per se,* and that the owner of the automobile is under duty to see that the machine is carefully operated so as to prevent injury to other persons using the street or highway, and that the case of *Barmore* v. *V. S. & P. Railway Co.,* 85 Miss. 426, 38 So. 210, 70 L. R. A. 627, 3 Ann. Cas. 594, is controlling in this case; that the doctrine therein adopted and announced by this court is sound and should be applied to motor vehicles. This case will be referred to later on in the opinion.

I am personally of the opinion (in which Judge HOLDEN does not concur) that if it be held that the ordinary automobile used for personal or family use upon the highway is not dangerous *per se,* that still the motor truck both for passengers and freight used for commercial purposes may be distinguished from the ordinary personal automobile, and that we certainly ought to draw the line on these heavy trucks used for the transportation of freight and passengers for commercial purposes, and hold the owners of such trucks responsible for the negligence of any person who the owner intrusts with their operation upon the public highways and streets of the state.

In the case before us the Vicksburg Gas Company had loaned its truck to one of its employees to take a party of friends on a Sunday out to the Military Park to engage in an Easter egg hunt. The servant to whom the truck was loaned was on duty all the time during the day subject to call at any minute to active service for the Company. The servant took the car and drove it out to the Military Park, and with him were a number of his friends. The manager of the Gas Company and his regular driver of the truck went out later to the park where the egg hunt was being carried on. An agreement was then made with the manager that the regular driver of the truck would take charge of the truck and drive the other employee and his family and friends back to their residences, and from thence carry the motor truck back to the plant of the Gas Company. On the return trip,

while this last arrangement was being carried out, the driver of the truck ran into an ordinary automobile in which the plaintiff was riding and injured it. Fortunately none of the persons were injured. The case was tried before a jury, and the jury found, upon competent evidence admitted for that purpose, that the driver of the truck, who was also on duty during the entire day subject to call at any minute by the Gas Company to any work it might need him to do, was negligent. In other words, the only question left open to reverse the case upon was whether the servant driving the car at the time was negligent while in and about his master's business.

It is the view of the court below that the Barmore case applies. And if it has application, the judgment must be affirmed as stated in the majority opinion.

There is, of course, a considerable difference in the views of the different states as to the doctrine of dangerous agencies; that is, agencies dangerous *per se* as characterized by the decisions of the different states of the union. Many of the states hold that an instrumentality is not dangerous *per se* if when it is standing in disuse it is not dangerous, while others hold that the question is to be determined by the methods of the ordinary operation of the truck or instrumentality. Our court, in the Barmore case beginning at 38 So. the bottom of page 213, 85 Miss. page 448, in a very able and lucid opinion by Judge TRULY, said:

"There is another theory developed by this record, which the appellant was entitled to have submitted to the consideration of the jury. It grows out of the well-established principle of law that a master who intrusts the custody and control of a dangerous appliance or agency to the management of a servant will not be permitted to avoid responsibility for injuries inflicted thereby on the plea that the servant, in the particular act complained of, was acting outside the scope of his employment. As stated in another connection in this opinion, we adhere to the general rule which exonerates the mas-

ter from liability for the acts of the servant committed
beyond the scope of his employment; but this rule is
not of universal application (being itself but an excep-
tion to the general rule which primarily imputes liability
to the master), nor is it antagonistic to the position here
assumed. The servant is empowered by the master to
discharge certain duties, and it is incumbent upon him to
exercise the same care and attention which the law re-
quires of the master; and if that care and attention
be about the management and custody of dangerous ap-
pliances, the master cannot shift the responsibility con-
nected with the custody of such instruments to the serv-
ant to whom they have been intrusted and escape liabil-
ity therefor. This rule arises from the absolute duty
which is owing to the public by those who employ in
their business dangerous agencies or appliances, engines
or instruments—liable, if negligently managed, to result
in great damage to others. The true rule, and the one
supported by reason and authority, is thus stated in *P.
C. & St. L. R. Co.* v. *Shields,* 47 Ohio St. 387, 24 N. E.
658, 8 L. R. A. 464, 21 Am. St. Rep. 840: 'If the master
intrusts the custody of dangerous agencies to his serv-
ants, the proper custody as well as the use of them be-
comes a part of the servant's employment by the mas-
ter, and his negligence in any regard is imputed to the
master in an action by one injured thereby. And where
the injury results from the negligence of the servant in
the custody of the instrument, it is immaterial, so far as
the liability of the master is concerned, as to what use
may have been made of it by the servant.' In such cases
the duty of the servant is to carefully guard and con-
trol such instrument, and a failure in this respect is not
a departure from the master's service, but a negligent
discharge of that service. This distinction is plainly
marked. As said in the *Shields case, supra*: 'A servant
may depart from his employment without making his
master liable for his negligence when outside the em-
ployment of the master, and he so departs whenever he

goes beyond the scope of his employment and engages in affairs of his own. But he cannot depart from the duty intrusted to him, when that duty regards the rights of others in respect to the employment of dangerous instruments by the master in the prosecution of his business, without making the master liable for the consequences; for the first step in that direction is a breach of the duty intrusted to him by the master, and his negligence in this regard becomes at once the negligence of the master.' This rule applies in all cases where agencies liable to be the means of inflicting serious injury upon others are placed in the custody of servants. The rule is designed for the protection of the public. As the master, if personally in control of the agency or appliance, would be liable for all injuries inflicted by its mismanagement or misuse so he is not permitted to delegate the performance of the absolute duty of care which is imposed on him in its custody and control so as to shift the responsibility for a failure to discharge it. *Birmingham W. W. Co.* v. *Hubbard,* 85 Ala. 179, 4 So. 607, 7 Am. St. Rep. 35; *Tex. & Pac. R. Co.* v. *Scoville,* 62 F. 730, 10 C. C. A. 479, 27 L. R. A. 179; 27 L. R. A. 200, note; 1 Thompson Com. on Neg. sections 523-533; *Euting* v. *Chi. & N. W. Ry. Co.* [116 Wis. 13], 92 N. W. 358, 60 L. R. A. 158, 96 Am. St. Rep. 936; *Regan* v. *Reed,* 96 Ill. App. 462; *Alsever* v. *Minn. & St. L. Ry. Co.,* 115 Iowa, 338, 88 N. W. 841, 56 L. R. A. 748. The case last cited was one where the servant into whose hands the master had committed the custody of an appliance to be used in its service allowed the steam or spray to escape so that a child standing by became frightened, fell, and was injured. The plaintiff sought to prove that the steam or spray was blown off with the deliberate design of frightening the children. The railway company defended on the ground that the escape of steam was incident to the operation of the engine, and was so used on the occasion in question. But the master was held liable; the court, after a full discussion of the ques-

tion, in which numerous authorities are cited and ana-
lyzed, stating its conclusion as follows:   'The company
had placed in his charge an instrumentality requiring
care in its operation and management.   He was doing
precisely what the company contemplated he should do
when it employed him—i. e., operating the blowoff cock.
When this was to be done, and how, as said, was left to
his discretion, the use of which was also contemplated
in his employment; and the company was as responsible
for a mistake or willful perversion of judgment in its
operation, if within the compass of what he was to do,
when amounting to negligence, as for his negligence in
doing that which may be conceded to have been neces-
sary.'

"The absolute duty of the master, which cannot be
delegated, in reference to the degree of care demanded
in the custody, control, and operation of dangerous in-
strumentalities, applies not to those alone which are
operated or propelled by the power of steam, electricity,
power, dynamite, or kindred forces, but to all instru-
mentalities employed by the master which, by reason of
the method of their operation, are capable of, and liable
to, inflict serious injury to others.   The motive power is
not the sole consideration in determining whether an in-
strumentality falls within the general classification of
'dangerous agencies and appliances.'

"An attempt has been made, in a very few illogically
reasoned cases, to draw a distinction between instru-
mentalities 'dangerous in themselves' and those 'dan-
gerous by reason of improper use,' and confine the
master's liability to cases due to mismanagement of the
former class alone.   An analysis will show that the dis-
tinction is more imaginary than real, and too refined to
be of any practical benefit as a method of determining le-
gal responsibility.   The argument has a degree of plausi-
bility when limited to agencies inherently dangerous even
when most carefully handled, such as dynamite and sim-
ilar substances, as distinguished from those of like char-

acter, such as gasoline, naphtha, and the like—only dangerous when proper precautions are not observed; but the sophistry of the argument becomes apparent, and refutes itself, when we come to the consideration of dangerous engines, machinery, or appliances. No appliance is 'dangerous of itself,' but practically every appliance may become 'dangerous by improper use.' Neither a locomotive, pile driver, electric or cable car, automobile, threshing machine, or team and wagon is 'dangerous of itself,' yet with practical unanimity the courts hold the master liable for damages caused thereby, even though the servant who has the sole custody and control thereof is at the time acting willfully, wantonly, and in disobedience to his master's orders. And so, on the other hand, an ax, a crowbar, a scythe, and similar implements in daily use, are equally as deadly when improperly used; but no court would hold a master liable for the tortious act of his servant on the ground alone that he had intrusted the custody of such appliance to the servant. No appliance when at rest is 'dangerous in itself.' It is by operation alone that it becomes capable of causing injury. So, in our opinion, a better test, though probably not itself without exceptions, of the master's liability, would be whether the agency or appliance, the custody and control of which he committed to his servant's judgment and discretion, was 'dangerous in itself,' or liable to inflict serious injury to others, when operated in the customary method of use and while being devoted to the purposes for which it was designed. If so, the public safety demands that he shall be answerable for the exercise of his servant's judgment. We are not without eminent authority for this position: 'Whenever a master sends his servant out beyond his own eye and immediate control, in the custody of any species of property of the master which, unless properly cared for, guarded, and used, is liable to work injury to third persons, it is necessarily a part of the duty which the master commits to the servant so to care for, guard, and use such

property as that it shall not work such injury.' 1
Thompson, Com. on Neg., section 589; *Vicksburg & J. R.
Co.* v. *Patton*, 31 Miss. 156, 66 Am. Dec. 552; *N. & C. R.
Co.* v. *Starnes*, 9 Heisk. [Tenn.], 52, 24 Am. Rep. 296;
*Phil. & R. Ry. Co.* v. *Derby*, 14 How. 468, 14 L. Ed. 502;
*Erie Ry. Co.* v. *Salisbury* (N. J. Err. & App.), 50 A.
117, 55 L. R. A. 578. And the soundness of this prop-
osition is plainly recognized by this court in *Canton Co.*
v. *Pool* [78 Miss. 147, 28 So. 823, 84 Am. St. Rep. 620],
*supra.* Though its application to the facts of that case
was correctly denied, it being there said that the case
there presented was 'not like cases when the question
is as to the custody of dangerous implements, as steam
engines, dynamite, torpedoes, etc., thus expressly recog-
nizing, that the same rule controls whether the injury
be caused by an agency "inherently dangerous" or by
an "implement" which only becomes dangerous by rea-
son of misuse.' In *Erie Ry. Co.* v. *Salisbury, supra,* the
master was held responsible for the acts of the servant
for injuries inflicted by a 'push car' which had been placed
in the custody of the servant, although at the time of the
injury the car was not being used in the service of the
railroad, but in the business of a third person to whom
the servant had loaned the car. The court says: 'When
the company placed the push car in the hands of the fore-
man, it was the duty of the foreman to use it with rea-
sonable care to prevent injury to any one lawfully on
the tracks and to keep it under his own supervision un-
til it was returned to the company. For the perform-
ance of that duty by the foreman the company was bound,
and the failure of the foreman to perform it was the
failure of the company. The company cannot claim im-
munity on the ground that its servant violated the in-
structions given to him, any more that it could set up in
defense that an engineer had violated the express in-
structions given to him to ring the bell at a public cross-
ing.' And the decision in the case is grounded upon the
true basic principle:    'The obligation to see that the

duty is performed is cast upon the owner of the road. The safety of the public demands that the company shall be strictly held to its performance.'

"It is, of course, impracticable, if not impossible, to state any general definition by which it may be de- cided with any degree of certainty what appliances or agencies do, and what do not, fall within the term 'dan- gerous,' as employed by courts and text-writers. The limit of human inventive genius has not yet been reached, and appliances are as variant as the uses to which they are devoted. And, again, something must depend on the circumstances attendant upon the use of the particular instrumentality in question. But we see no reason, justice, or legal principle in the distinction which would allow compensation for an injury inflicted by the mis- use of a locomotive, electric car, or horse and wagon, and yet deny recovery, though the injury is to the same extent, and inflicted under similar circumstances, when caused by the mismanagement of a hand car or railroad tricycle. While the propelling power differs in each in- stance cited, all are subject to human control, and all are alike liable to cause serious injuries to others, and this is the real reason on which the liability of the· owner is founded.''

Judge Whitfield, in an elaborate opinion character- ized by his usual polemical perspicuity, took the contrary view, and cited at great length the authori- ties which took that view in other states. But the ma- jority opinion is, of course, the law of the state, and has been widely approved throughout the country in both aspects of the opinion. See *Moore* v. *Wabash R. Co.,* 299 Ill. 596, 132 N. E. 816; *Jefferis* v. *C. & N. W. R. Co.,* 147 Iowa, 124, 124 N. W. 370; *Penas* v. *C. M. & St. P. R. Co.,* 112 Minn. 203, 127 N. W. 931, 30 L. R. A. (N. S.) 627, 140 Am. St. Rep. 470; *Dalrymple* v. *Motor Co.,* 66 Or. 533, 135 P. 93, 48 L. R. A. (N. S.) 424; *George* v. *Carstens Co.* (Wash.), 158 P. 531; *Lusk* v. *Phelps,* 71 Okl. 150, 175 P. 758; *Webber* v. *Phister,* 70 Colo. 79,

197 P. 766; *Dockweiler* v. *American Piano Co.*, 94 Misc.
Rep. 712, 160 N. Y. S. 270, 274; *Colley* v. *Lewis*, 7 Ala.
App. 593, 61 So. 39; *Black* v. *Rock Island, A. & L. R.*,
125 La. 101, 51 So. 85, 26 L. R. A. (N. S.) 166; *God-
frey* v. *Conn. Co.*, 98 Conn. 63, 118 A. 448; *Houston,
Central Arkansas & Northern R. Co.* v. *Bolling*, 59 Ark.
395, 27 S. W. 492, 27 L. R. A. 190, 27 L. R. A. 200 and
note, 43 Am. St. Rep. 38; *Pittsburgh C. & St. L. R. Co.*
v. *Shields*, 47 Ohio St. 387, 24 N. E. 658, 8 L. R. A.
464, 21 Am. St. Rep. 840; *Block* v. *Hirsh*, 256 U. S.
135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 170.

In *Weil* v. *Kreutzer*, 134 Ky. 563, 121 S. W. 472, 24
L. R. A. (N. S.) 557, the court said:

"Greater care was incumbent upon him by reason of
the deadliness of the machine he was propelling along the
highway. The possession of the deadly and dangerous
instruments always entails great care upon the possessor.
One who walks along a crowded thoroughfare with a
sharp scythe in his hands must use greater care in han-
dling this instrument than would be required of him if he
held an umbrella or small cane. The degree of care one
must use always bears a direct ratio to the degree of in-
jury which would probably be caused by negligence.
When one comes through the highways of a city with a
machine of such deadly force as an automobile, it is in-
cumbent upon the driver to use great care that it be not
driven against or over pedestrians. An automobile is
nearly as deadly as, and much more dangerous than, a
street car or even a railroad car. These are propelled
along fixed rails, and all that the traveling public has
to do to be safe is to keep off the tracks; but the auto-
mobile, with nearly as great weight and more rapidity,
can be turned as easily as can an individual, and for this
reason is far more dangerous to the traveling public
than either the street car or the railway train."

In *Southern Cotton Oil Co.* v. *Anderson*, 80 Fla. 441,
86 So. 629, 16 A. L. R. 255, the Florida supreme court,
in an opinion of great cogency, force, and reason, has

held that a motor vehicle operated upon the public highways is a dangerous instrumentality, and that the owner who intrusts it to another to operate is liable for injury caused to others by the negligence of the person to whom it is intrusted, and in the opinion quotes from Pollock on Torts, p. 506, as follows:

"The law takes notice that certain things are a source of extraordinary risk, and a man who exposes his neighbor to such a risk is held, although his act is not of itself wrongful, to insure his neighbor against any consequent harm not due to some cause beyond human foresight. . . . Sometimes the term 'consummate care' is used to describe the amount of caution required, but it is doubtful whether even this be strong enough. At least, we do not know of any English case of this kind (not falling under some recognized head of exception) where unsuccessful diligence on the defendant's part was held to exonerate him. . . . This amounts to saying that, in dealing with a dangerous instrument of this kind, the only caution that will be held adequate in point of law is to abolish its dangerous character altogether."

The opinion continues: "It is true that, in the early development of this very salutary doctrine, the dangerous agencies consisted largely of fire, flood, water, and poisons. . . . The underlying principle was not changed, but other agencies were included in the classification. Among them are locomotives, push cars, street cars, etc., and it is now well settled that these come within the class of dangerous agencies, and the liability of the master is determined by the rule applicable to them. The reasons for putting these agencies in the class of dangerous instrumentalities apply with equal, if not greater, force, to automobiles."

On page 260 of 16 A. L. R. (8 Fla. 441, 448, 86 So. 629, 632), the court said: " 'The principles of the common law do not permit the owner of an instrumentality that is not dangerous *per se,* but is peculiarly danger-

ous in its operation, to authorize another to use such instrumentality on the public highways without imposing upon such owner liability for negligent use. The liability grows out of the obligation of the owner to have the vehicle, that is not inherently dangerous *per se,* but peculiarly dangerous in its use, properly operated when it is by his authority on the public highway. In view of the dangers incident to the operation of automobiles, and of the duties and obligations of the owners of motor vehicles under the statutes of the state, it could not be said that, on the facts of this case, no question was made for the jury to decide.' *Anderson* v. *Southern Cotton Oil Co.,* 73 Fla. 432, 74 So. 975, L. R. A. 1917E, 715.''

In discussing the question of what was dangerous (80 Fla. 441, 449, 86 So. 629, 632, 16 A. L. R. 260, second column), the court said:

''Much confusion has resulted from the use by the courts and text-writers of a term so inadequate and unfit as 'dangerous *'per se'* in discussing the liability of the owner of an instrumentality that is peculiarly dangerous in its operation, who permits another to run it on the public streets and highways.

''Wild animals and high explosives are dangerous *per se;* that is, they may inflict injury without the immediate application of human aid or instrumentality. Neither a locomotive, a trolley car, nor an automobile is dangerous *per se*—by or through itself—in that neither can inflict injury to a person except by its use or operation. A locomotive in the roundhouse, a trolley car in the barn, an automobile in a garage, are almost as harmless as canary birds; but, in operation, they are dangerous instrumentalities, and the master who intrusts them to another to operate—the one, on its right of way; the others, on the public highways—cannot exonerate himself from liability for injury caused to others by the negligence of those to whom they are intrusted.''

The court then quotes from *Barmore* v. *Vicksburg, S. & P. R. Co., supra,* and then says: ''A judicial opinion

on established facts and well-known conditions, counter
to the common opinion of the many on the same subject,
is persuasive only to those who desire to accept the un-
reasonable and reject the obvious.''

The court quotes statistics to show that the automobile
is one of the greatest instruments of peril known to the
country. The opinion of the Florida court throughout
is so cogent and logical that I think we ought to follow
it although the greater number of authorities of other
states refuse to class motor vehicles, at least automo-
biles, as being within the class of instrumentalities dan-
gerous *per se,* imposing liability for their negligent op-
eration whether in service of the owner or not. I do not
think we ought to go by mere numbers in following pre-
cedents of other states. The court ought to follow the
best reasoned opinions having in view the safety of the
public using the highways. A forty-minute speech by a
Webster may have more force and convincing power than
the fulminations of forty speakers of lesser capacity,
judgment, and ability with unlimited time.

The automobile is certainly destructive to life and
limb, and the operator should be held to strict account-
ability when using the public highways. The owner of
such an instrumentality knows of its dangerous and de-
structive capacity, and he ought not to intrust it to any
one except a person of great skill, prudence, and cau-
tion.

But when we come to consider the freight truck and the
great passenger trucks being used upon the highways,
carrying great loads and having great weight and
enormous power, being able to sweep out of the road
any ordinary automobile, to say nothing of persons and
animals, it seems ridiculous to hold that they are not
dangerous *per se* within the meaning of that rule as ap-
plied to railroad cars, motor vehicles, and similar in-
strumentalities.

The court in the Barmore case laid down a safe rule,
one calculated to promote the public safety and welfare,
and we should follow it, although the instrumentality

140 Miss.—36.

there was a motorcycle used on a railroad track, while here the instrumentality is a truck operated upon a highway. The truck has enormously more power and weight than a motorcycle of the type and character dealt with in the Barmore case. It seems to me that the very fact that usually these trucks are of great weight, carry great loads, and have enormous power is sufficient to distinguish them from the ordinary passenger automobile used for personal and family use. I therefore think the judgment of the lower court should be affirmed.